Our second case is people of the state of Illinois v. Anthony Gay for the appellant Scott Main for the appellee John Teefee, and this is case number 4100369. Please proceed. Good morning your honors. Good morning. May it please the court. My name is Scott Main and I am appearing on behalf of Anthony Gay where based on a substantial showing of multiple constitutional violations we are asking this court to demand a matter for an evidentiary hearing. I have one brief clarification or question to ask. In February I had filed a motion to cite a deposition as persuasive authority which has not been ruled on to my knowledge, at least as of yesterday, that had not been ruled on yet. I don't know if you're aware. I would have to check the file on that but we would rule on it in order. Okay. I'm not specifically intending to rely on it. Whose deposition was it? It was a deposition of a Dr. Scott who Anthony has an ongoing litigation basically stating with conditions of confinement that he is at imminent risk of serious bodily harm through his treatment in confinement camps. So he is an outside psychiatrist who was brought in to do an evaluation of Anthony and I thought that basically the reason why this motion was filed was to give the court some sense of what could come at an evidentiary hearing, that there are opinions that could be gathered if this were to be sent back. Aren't we supposed to be reviewing retrospectively the decision of the trial court? Obviously, yes. How would this deposition apply to our retrospective assessment of whether the trial court was correct? Well, I think that why it would apply, and again, this is not obviously a traditional authority that one usually cites in a motion such as this, but there are a number of factual questions that are being raised, factual issues that are being debated here in the appellate court, which we still maintain is improper, that because of all these questions that are going into the question of whether or not Mr. Gay even suffers from mental illness indicate why this matter should be sent back for an evidentiary hearing. So the reason why this is even brought out as an illustration for you is simply to provide you some idea that this is an open question, that these questions do exist and there are opinions on both sides. Counsel, let me interrupt you. Mr. Teefee, have you seen the motion that counsel is discussing before the court at this point? I have, yes. And what's your position on whether the court should grant or deny that motion? My position is pretty closely related to Justice Stein's, but I don't think that it would. I mean, I understand that it's a lot like, in my opinion, the amici briefs that were filed. I think it's an opinion on things that are outside the record, and they were not part of the trial for the amici's ruling on the post-conviction position. And for that reason, I don't think that it would assist this court in ruling on the constitutionality of his, as the defendant would argue, de facto license. I do not believe it would assist this court at all. Okay, thank you. Please proceed with your argument. Progress starts somewhere. Adherence to our system of justice has allowed Anthony Gay to enter into the Department of Corrections in 1994 to serve a seven-year sentence, and now face an outdate of 2095. Our discretionary system of prosecution has allowed the state to decide how and when to bring criminal charges. Our sentencing structure requires each conviction that the state obtains, based on conduct that occurs while incarcerated, to be served consecutively. But our constitution requires that we conform our sentencing practices to an evolving standard of decency. In its most basic sense, the Eighth Amendment allows for humanity. Ultimately, fairness is not forced to bend to the law. The law bends to fairness. In 1989, the U.S. Supreme Court held that the Eighth Amendment did not preclude the execution of mentally retarded individuals. Thirteen years later, the court reconsidered that holding and reversed itself. A few years after that, they applied that same new holding to juveniles. And five years later, in Graham, the court ruled that the Eighth Amendment prohibits juveniles who committed non-homicide offenses to serve a life without parole sentence. The Graham decision is the first time that the court ruled an entire category of punishment outside of the death penalty to be unconstitutional. In Illinois, lifetime incarceration is the most severe punishment that's available. Like execution, a life sentence imposes a terminal, unchangeable, once-and-for-all judgment upon the whole life of a human being and declares him... Are you arguing against that? I'm, of course, arguing, yes. I thought the hard argument about the abolition of the death penalty was that we don't need it because you can impose a life sentence without possibility of parole. And that's... Or was that last week's argument? That's not last week's argument, Your Honor. Well, was I mistaken that that was the argument against the death penalty? That was certainly one of the arguments against... Aren't you undermining that argument with the argument you just made? That... Well, it's the question that one of the issues that the courts were looking at in the death penalty context was the moral reprehensibility of the offense. The societal outrage that goes against the court. And that's... You know, Graham brought in this question of the moral culpability. And it's looking at... You're looking at not just the nature of the offense, but you're looking at the offender as well. And that's why I think that this isn't the same argument as in the death penalty context. Because now we're looking at situations where we are dealing with a series of, you know, disgusting offenses, but, you know, nonviolent and... I thought the life sentence without possibility of parole is contrary to... What's that wonderful phrase? Evolving standards that mark the evolution of, you know... And, you know, what's really interesting is I don't recall the amendments to the Eighth Amendment to provide for all of this. I guess you have to read it carefully to figure those things out, to understand how that worked. But aside from that, if it's morally reprehensible to have someone in prison serving a life term, how about 50 years? Well, I think that... Would that be next week's argument? No, sir. That that's in violation of the Eighth Amendment? I think that what Graham holds, and really, at the end of the day, what we're discussing here is the notion of a sentence that does not allow for a meeting opportunity at some point for release. Graham did not say that... Well, would 50 years provide for that? Would a 50-year sentence? A 50-year sentence, depending on the offender, it could. And particularly, again... So if he's 35, would it be meaningful? Or is that just essentially the equivalent to a life sentence, and therefore unconstitutional? You always are going to have to take into account the nature of the offender. And I think that you always are going to have to take into account the nature of the offense. And I think that when you're having these conversations, this isn't simply a... You know, I think that it's important to remember that specifically within the confines of the Eighth Amendment, I think, unlike many other portions of our Constitution, that is the area in which our Court has fully embraced the notion of this being a breathing document, a living, breathing document, that certainly allows for the evolving standards of decency. And so, does that allow for new arguments to be raised? Yes, it does. And does that allow for courts to reconsider its previous determinations, that something did not run afoul of the Eighth Amendment, to determine that now it does, because of our traditional notions and our ever-evolving standards? Yes, it does. So a life sentence under our evolving standards is now unconstitutional? Well, specifically right now for the holding in Graham is for juvenile offenders for non-homicide offenses. So I'm asking you, is a life sentence now under... Should we be the first in this progressive parade of evolving judicial decisions to say it's unconstitutional? Is that what you're asking? I'm asking this Court to remand the matter for an evidentiary hearing. I'm asking the Court to... Because it's... Because it's... This life sentence is unconstitutional? There is a substantial question that this sentence... So the trial court on remand, if we grant your request, should be the first to so hold? I think that this case allows that opportunity. I mean, basically... I know it would allow the opportunity. I'm asking you, should it so hold? Absolutely. Absolutely. Then why shouldn't we do it now instead of telling the trial court? Because we're premature at this point. I mean, we need a record in order to fully develop these claims in order for them to be better litigated. Right now, the question before this Court is whether a substantial showing of a constitutional violation has been alleged. And I think that, you know, an important thing to think about as well is that back at the second stage hearings, the State had an option. They could move to dismiss, or they could answer the complaint, or they could answer the PC. They moved to dismiss. So they've admitted all of the factual allegations that are not positively rebutted by the court. I think that's well pleaded, isn't it? Yeah. Non-conclusory. All non-conclusory, well pleaded. And here we have an amendment claim that addresses the totality of the sentence, the 95 years, 97 years, in fact, of additional time that is being served consecutively. It's the question in front of the Court to which the State agreed. This Court, involving your client a few months ago, rejected all these same arguments. Did it not? It did. And for you to succeed now, would we have to reverse the position taken? I think what was wrong in the previous decision is this question of second stage and third stage review. I think that it created a jumble of appellate review where it was asking factual questions. It was engaging in factual analysis. And it was not doing the simple question of whether or not a substantial showing of a constitutional violation, which had not been positively rebutted by the court. And so would this court need to reverse the decision in another case? This case would need to look at this record and determine that a substantial showing of a constitutional question does exist. And it is the same Eighth Amendment claim because it is the same question of whether or not these 97 years for these 16 convictions offend our evolving notion of Eighth Amendment jurisprudence. Specifically, in getting back to, I think, one of the initial questions of, you know, is this sort of the flavor of the week? I don't think so. I think what this is is the idea that we are looking to the question of these categorical classes. And we have the categorical classes identified in Atkins. What's the categorical class here? The categorical class here, specifically, is whether or not the rulings from Graham and Atkins should be extended to embrace as a categorical class individuals with severe mental illness whose conditions of confinement has led to additional convictions based on conduct that is symptomatic of that mental illness. So if we agreed with you, what would be the ultimate outcome with regard to Mr. Gay? Would just let him go home, maybe live in your basement? What do we do? What happens to Mr. Gay? Mr. Gay, pursuant to Graham, only needs to be afforded a meaningful opportunity for release. And that means that... What does that mean? You mean as if forgetting about the various criminal convictions, those would be just erased? We're not looking to erase the convictions. We're not looking to alter at this point. Again, this, again, I think belies the very reason why this should go back for an evidentiary hearing. Well, if he succeeds, what would be the argument to the trial court? What happens to Mr. Gay? Where should he be? If you were in charge of the world, where would Mr. Gay be tomorrow? Tomorrow he would be at Dixon. He'd be where? He would be at Dixon. The mental health facility? The mental health facility. Okay. And when he attacks people there, what would you do? We would not simply punish this behavior that's symptomatic, that is symptomatic of a mental illness. We would, of course, notions of security, everything like that still has to be respected and still has to be managed. So he's not out on the street? He's not immediately going out on the street, but we are responsible for providing... That immediately is somewhat disturbing. Apparently he's going to be out on the street. No, no, no, no. At some point? And again, no, under Graham, Graham does not require release. Graham only requires the quote being, a state need not guarantee the offender eventual release. But if it imposes a sentence of life, it must provide him or her with some realistic opportunity to obtain release before the end of that term. And so I think at this point, what are we saying? Maybe we are saying 35 years. Maybe we are saying at some point, once he's been provided the proper therapeutic treatment, which is possible. And that's the remarkable thing about this record, is when you look at those evaluations of that window back in 2000, when he was first transferred from TAMS to Dixon, where he was actually improving, where the self-mutilation was stopping, where the insolence was stopping because he was being provided the care that he needed. And still within the correctional setting in which we're still, you know, we're treating this as serious. We are treating these things as not something where you're simply letting someone else out on the street. But you are addressing the underlying mental illness, which we simply can't do under, you know, it's not happening now with TAMS. So what caused him to be removed from Dixon? He improved. So he got better and they put him in a different facility? And that's when they sent him to Pontiac. And that's when the first day at Pontiac, he self-mutilated again. The first, within a few days of Pontiac, he reinstated, he started throwing urine and feces on guards. And that's the 10-month window, this 10-month window of his entire time of incarceration that have been prosecuted for, obviously, you know, Mr. Gay has a very long and detailed history of infractions, disciplinary infractions, at the Department of Corrections. But somehow during this time at Pontiac, the State's Attorney's Office selected 21 of these to institute prosecutions. And that's where Pontiac, it was, you know, because of these ongoing infractions, he's forced to use segregation, he's at the lowest level of privileges in terms of time out of cell. Even unlike TAMS, at Pontiac, you're in a concrete cell with a solid steel door. There's no ventilation. It's some of the harshest conditions that we face. And so it was to take him out of Dixon, to take him out of the area where he was receiving the therapeutic care that actually showed him having some improvement that was indicated on the clinical assessments, to then move him to Pontiac, it immediately led to a very severe decompensation. And that continued as a pattern for those 10 months until he was removed from Pontiac and sent to Stateville, where all of a sudden these criminal charges had disappeared. But there's still the ongoing question of how we respond to these individual actions. So that's what's, you know, I hope that I'm getting at some of your questions. I was never clear about your response to Justice Stein's question, whether you're asking us to reverse this court's decision from November of 2011. I think at the end of the day, yes, this court does need to reverse that, or this court needs to issue a decision that rejects and reverses the holding in the 09 case. At the time you filed your reply brief, you indicated you would be appealing that decision. Have you done so? A petition for leave to appeal is currently pending. Okay, it's pending. And I think that, and again, because this is the same, we are dealing with the same amendment claim, I think that really somehow this case should go back for an evidentiary hearing. And be it in this case or be it if the Illinois Supreme Court were to grant relief or supervise the authority, this matter should be back in front of the trial court where evidence can be introduced, where factual questions can be answered. The 09 decision, the 41009 decision, there's an entire paragraph which is just questions such as you're asking of, you know, what to do, when is he to be released. We can't be answering that right now. We can just be stating that this record shows that there needs to be further evidence introduced where we can answer the questions posed by Graham and we can move, attempt to move this court forward and introduce the notion that individuals with severe mental illness whose symptomatic behavior is then simply being charged criminally and not being charged, or not being cared for also therapeutically, who now face life incarceration, that that sentence would violate the 8th Amendment. And so under Graham, under these traditional notions of fairness, at some point, Mr. Gay should be given a meaningful opportunity for release if the opportunity, or if the therapeutic services have provided and allowed for his possible reentry into society. I thank you for your time. Thank you, counsel. You will have your time. Mr. Teefee, please. May it please the court, counsel. My name is John Teefee. I am here on behalf of the state. As counsel for defendant, inform this court, basically what he's asking this court to do is give this case back to the trial court so they can have an evidentiary hearing. As also was discussed, this court basically decided in People Be Gay back in November of 2011, this issue on the exact facts. So I don't want to say too much. I believe that the state's case here is well settled in this court's prior decision. But there's a few things that I want to point out. I believe what the defendant is attempting to do here is he's trying to take Graham. And I do not believe that the U.S. Supreme Court ever intended for Graham to open up this box of new categorical limitations. I believe they saw a unique opportunity there with juveniles, a unique situation with what they found to be a less culpable part of society. And I think there's some key distinctions when we look at a limitation of juveniles and a limitation in general of mental ill defendants. And he gave a more specific definition of what it looked like to have a categorization of mentally ill. But I still think that's the first argument. It is really easy to define a juvenile. Is the defendant 14? Okay, he's a juvenile.  All right, he's not a juvenile. But I think if we add a new categorical limitation of mentally ill people, it is really going to be difficult for this court and any court in the future to decide, okay, what is mentally ill enough? What does that look like? At what point are they mentally culpable? And I think if you look at the specific defendant in this case, the reason why the trial court did not find that it was required or needed to go into an evidentiary hearing is because the facts before it, even the facts written in the defendant's post-conviction petition, show that he was culpable. He knew exactly what he was doing. If you look at his post-conviction petition, the defendant specifically says, the petitioner was depressed, obsessed, and in love with the psychologist in TAMS. The petitioner wanted to transfer back to TAMS to be with the psychologist. The petitioner had no intentions of injuring anybody. Right there, he talks about his intentions. And then he ends with, the petitioner started throwing liquid substance with a conscious, reckless disregard on correctional officers in an attempt to force a transfer to TAMS Supermax. So even if somewhere in the future this court or another court did find that there was this categorical limitation based on mentally ill people, I do not believe that the facts before this court would even put this specific defendant in that category. I believe that the facts in front of the trial court and the facts in front of this court show that this specific defendant was mentally culpable of his actions. And I think that's further one of the things defense counsel said, too, is while this defendant was in Dixon, he improved, and that's why he was sent back to Pontiac. And the defense counsel said, well, the first day he was back at Pontiac, he started the self-mutilation and he started assaulting officers. Well, to me that doesn't indicate that this defendant had improved that much. If the first day he goes back to Pontiac, he starts this assaultive behavior. It also doesn't show me that his assaultive, manipulative behavior was a result of his time at Pontiac. It shows me, as I believe the record does, and I believe that this is another reason why the trial court did not seem to think that they needed to do an evidentiary hearing, because the record and the evidence clearly shows that this defendant made an attempt over and over to manipulate Pontiac to send him back to TAMS. That was his goal all along. He was explicit about that goal. He informed the trial court of that goal in his post-conviction petition. And so in summary, I believe that even if there was this categorical limitation, this specific defendant would probably not find himself in that categorical limitation. The second problem that I see with this is that juveniles, at some point, will age out of this categorical limitation. When they hit, the federal law says when they hit 18, okay, they're no longer juveniles. The problem we're going to have with mentally ill people is if, is there any fine line with, okay, they're no longer mentally ill, so we can start charging them again for offenses in prison. Or, once they hit the de facto life sentence, may a mentally ill person in prison just have free reign to do whatever they want without any fear of conviction, sentence, charges, or anything. And as this court stated in its previous decision in Anthony v. Gay, there are many questions that simply can't be answered, and they won't be answered by the evidentiary hearing. And one of those questions is, at what point, and Justice Eichmann said this too, at what point does it become a life sentence? Can a non-smoker be sentenced to a longer sentence because his lifetime may be longer? And those aren't questions that can just be remanded back to the trial court, and there's going to be evidence that provided. I mean, those are going to be difficult questions that I believe speak to the idea that we just cannot make a categorical limitation for mentally ill. I think it's too much of a mess, and even before this court, this specific defendant does not fall in that category. And like I said, I believe that, and I don't know if there's, I don't want to speak too much because I believe that this case has been decided. I believe the facts of this case are no different than this court's previous decision in people v. Gay. So if this court does not have any other questions, that ends my argument. Seeing none, thank you, counsel. Thank you, Your Honor. Against all my better instincts, I will also try to be brief as well. There's just a few points I'd like to make, and the first is, obviously, as a categorical class, juveniles are very easy to find. But courts are always making determinations of mental illness,  of how an individual's mental illness may impact, you know, guilty but mentally ill. I mean, we've got definitions in the code in terms of what courts should be looking to and what courts should be assessing. And there are any number of different ways that courts are specifically equipped to handle these questions, and these are questions they handle every day. I think you would argue just because they may be difficult questions doesn't mean that the court should avoid them. Absolutely. And I think that counsel, you know, made the comment that perhaps this is just simply too much of a mess, but we can't ever throw up our hands. And I think that that's the inclination in a case like Anthony Gay's, where it is this desire to sort of sit back and just throw up your hands, and what can we do? That can't happen. That can't happen when we are criminalizing this conduct, which is horrible but not atypical. It's not unusual. It happens every day in the correctional setting that guards, that urine and feces are thrown through food hatches. It happens particularly in SHU and, you know, the idea of the maximum security facilities. This happens. It's unfortunate. It is true. But we're dealing with individuals who have no access. They have no agency. They have no ability to see another human being, and this is clearly tied to a diminished capacity and a diminished moral culpability, which is one of the things that courts can be answering and one of the things that courts can be looking to when they are addressing questions such as these. Gay's mental illness makes him easy to dislike. That might be one of the reasons why the $2 piece of plastic hypothesized by Judge Frank was not instituted and employed to protect the guards in this case. It may also, you know, explain why his cases were selected for criminal prosecution in Livingston County. And it also probably explains why over one quarter of Mr. Gay's life has now been spent at TAMS in a state of severe social isolation. But this court does not have to simply stand by and accept those explanations. While this court may not be able to tell the state or the Department of Corrections what to do, this court can say that what they did was wrong. And we ask this court to remand this matter for an evidentiary hearing so that basically to address these fundamental constitutional questions that equity favors review in these situations. And for these reasons, we ask that you remand this case. Thank you for your time. Thank you, counsel. Indeed, thanks to both of you. The case is submitted and the court stands at 3-6.